**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

JOHNNIE R. ROBERTS                                    CIVIL ACTION

VERSUS                                                       NO. 14-2119

N. BURL CAIN, WARDEN                          SECTION: "G"(1)

**REPORT AND RECOMMENDATION**

This matter was referred to this United States Magistrate Judge for the purpose of conducting a hearing, including an evidentiary hearing, if necessary, and submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and (C) and, as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases in the United States District Courts.  Upon review of the record, the Court has determined that this matter can be disposed of without an evidentiary hearing.  See 28 U.S.C. § 2254(e)(2).  Therefore, for all of the following reasons, **IT IS RECOMMENDED** that the petition be **DISMISSED WITH PREJUDICE**.

Petitioner, Johnnie R. Roberts, is a state prisoner incarcerated at the Louisiana State Penitentiary in Angola, Louisiana.  On March 12, 2002, he was convicted of forcible rape, intentional exposure to the AIDS virus, and second degree kidnapping.[1]  On May 1, 2002, he was found to be a fourth offender.[2]  On May 30, 2002, he was sentenced to the following terms of imprisonment:  life without benefit of probation or suspension of sentence on the forcible rape

---

[1] State Rec., Vol. 2 of 7, trial transcript, p. 186; State Rec., Vol. 4 of 7, minute entry dated March 12, 2002; State Rec., Vol. 1 of 7, jury verdict forms.
[2] State Rec., Vol. 1 of 7, transcript of May 1, 2002; State Rec., Vol. 1 of 7, minute entry dated May 1, 2002.

conviction; ten years on the intentional exposure to the AIDS virus conviction; and forty years without parole, probation, or suspension of sentence on the second degree kidnapping conviction. It was ordered that those sentences run concurrently.[3]  On March 26, 2003, the Louisiana Fourth Circuit Court of Appeal affirmed his convictions and sentences.[4]  The Louisiana Supreme Court then denied his related writ application on April 23, 2004.[5]

On August 26, 2004, petitioner filed an application for post-conviction relief with the state district court.[6]  The Court denied relief in an ambiguous ruling on September 7, 2004,[7] and then again in an unambiguous ruling on September 30, 2004.[8]

On February 9, 2005, petitioner filed with the state district court another post-conviction application, as well as a number of related motions.[9]  The court denied relief on April 26, 2005.[10] His related writ applications were then likewise denied by the Louisiana Fourth Circuit Court of Appeal on June 22, 2005,[11] and by the Louisiana Supreme Court on April 24, 2006.[12]

On June 21, 2013, petitioner filed another post-conviction application with the state district court.[13]  That application was denied on August 20, 2013.[14]  Petitioner's related writ applications

---

[3] State Rec., Vol. 2 of 7, transcript of May 30, 2002; State Rec., Vol. 1 of 7, minute entry dated May 30, 2002.

[4] State v. Roberts, 844 So.2d 263 (La. App. 4th Cir. 2003); State Rec., Vol. 1 of 7.

[5] State ex rel. Roberts v. State, 870 So.2d 294 (La. 2004); State Rec., Vol. 1 of 7.

[6] State Rec., Vol. 1 of 7.  Federal habeas courts must apply Louisiana's "mailbox rule" when determining the filing date of a Louisiana state court filing, and therefore such a document is considered "filed" as of the moment the prisoner "placed it in the prison mail system."  Causey v. Cain, 450 F.3d 601, 607 (5th Cir. 2006).  That date cannot be determined with certainty with respect to this filing; however, the Court will assume for the purposes of this decision that petitioner placed the application in the prison mail system on the date he signed it, i.e. August 26, 2004.

[7] State Rec., Vol. 1 of 7, Judgment dated September 7, 2004.

[8] State Rec., Vol. 1 of 7, Judgment dated September 30, 2004.

[9] State Rec., Vol. 1 of 7.  For the purposes of this decision, the Court is again assuming that this application was placed in the prison mail system (and, therefore, "filed" for AEDPA purposes) on the date it was signed.

[10] State Rec., Vol. 1 of 7, Judgment dated April 26, 2005.

[11] State v. Roberts, No. 2005-K-0743 (La. App. 4th Cir. June 22, 2005); State Rec., Vol. 6 of 7.

[12] State ex rel. Roberts v. State, 926 So.2d 533 (La. 2006); State Rec., Vol. 6 of 7.

[13] State Rec., Vol. 7 of 7.  Once again, the undersigned is simply considering the signature date as the date of filing.

[14] State Rec., Vol. 1 of 7, Judgment dated August 20, 2013.

were then likewise denied by the Louisiana Fourth Circuit Court of Appeal on October 9, 2013,[15]

and by the Louisiana Supreme Court on July 31, 2014.[16]

On or after September 15, 2014, petitioner filed the instant federal application seeking

habeas corpus relief.[17]   The state filed a response arguing that the application should be dismissed

as untimely,[18] and petitioner filed a reply to that response.[19]

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") provides:

> A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court.  The limitation period shall run from the latest of –
>
> > (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
> > (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;
> > (C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
> > (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2244(d)(1).

---

[15] State v. Roberts, No. 2013-K-1352 (La. App. 4th Cir. Oct. 9, 2013); State Rec., Vol. 1 of 7.

[16] State ex rel. Roberts v. State, 146 So.3d 205 (La. 2014); State Rec., Vol. 7 of 7.

[17] Rec. Doc. 1.  "A prisoner's habeas application is considered 'filed' when delivered to the prison authorities for mailing to the district court."  Roberts v. Cockrell, 319 F.3d 690, 691 n.2 (5th Cir. 2003).  Because petitioner signed his federal application on September 15, 2014, it was obviously given to prison officials for mailing on or after that date.

[18] Rec. Doc. 18.

[19] Rec. Doc. 19.

Clearly, Subsections B and C are inapplicable in the instant case, in that petitioner does not claim either the existence of a state-created impediment to filing or a newly recognized constitutional right.  Moreover, for the following reasons, it is clear that petitioner's federal application is untimely under both Subsections A and D.

### 28 U.S.C. § 2244(d)(1)(A)

The state argues that Subsection A applies.  If that subsection applies, petitioner's federal application is untimely for the following reasons.

As noted, under Subsection A, a petitioner is required to bring his Section 2254 claims within one (1) year of the date on which his underlying criminal judgment becomes "final."  On that point, the United States Fifth Circuit Court of Appeals has explained:

> The statute of limitations for bringing a federal habeas petition challenging a state conviction begins to run on "the date on which the [state] judgment became final by the conclusion of direct review or the expiration of the time for seeking such review."  28 U.S.C. § 2244(d)(1)(A).  When a habeas petitioner has pursued relief on direct appeal through his state's highest court, his conviction becomes final ninety days after the highest court's judgment is entered, upon the expiration of time for filing an application for writ of certiorari with the United States Supreme Court.  Roberts v. Cockrell, 319 F.3d 690, 693 (5th Cir. 2003).

Butler v. Cain, 533 F.3d 314, 317 (5th Cir. 2008).

Here, the Louisiana Supreme Court denied petitioner's direct-review writ application on April 23, 2004.  Therefore, at the latest, his state criminal judgment became final for AEDPA purposes, and his federal limitations period commenced under Subsection A, ninety days later on July 22, 2004.[20]  Accordingly, his limitations period would then then have expired one year later on July 22, 2005, unless that deadline was extended through tolling.

---

[20]  The state argues that petitioner's state criminal judgment became final even earlier, opining that his direct-review writ application was untimely filed with the Louisiana Supreme Court.  It is true that, for AEDPA purposes, a state

The Court first considers statutory tolling.  Regarding the statute of limitations, the AEDPA expressly provides:  "The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection."  28 U.S.C. § 2244(d)(2).

After thirty-four (34) days elapsed, petitioner tolled his federal limitations period by filing a post-conviction application with the state district court on August 26, 2004.[21]  That motion was denied on September 30, 2004,[22] and the motion therefore ceased to be "pending" for AEDPA purposes no later than November 2, 2004, when his time expired for seeking further review.  See Grillette v. Warden, Winn Correctional Center, 372 F.3d 765, 769-71 (5th Cir. 2004) (a state application ceases to be pending when the time for supervisory review expires).[23]

---

criminal judgment becomes final upon the expiration of time for seeking further review. Butler, 533 F.3d at 317. Therefore, if a petitioner misses the filing deadline for seeking review by the Louisiana Supreme Court, then his judgment is considered final thirty days after the Court of Appeal's judgment, and that fact is not changed even if he later seeks review by filing a untimely writ application with the Louisiana Supreme Court.  See, e.g., Wilson v. LeBlanc, Civ. Action No. 12-2577, 2013 WL 4648474, at *2 (E.D. La. Aug. 29, 2013).  However, as the state acknowledges in its response, it is not clear that petitioner's Louisiana Supreme Court writ application was in fact untimely filed. Rec. Doc. 18, pp. 16-17.  In light of that fact, and because his federal application is clearly untimely in any event, the undersigned has simply assumed for the purposes of this decision that the Supreme Court filing was timely.

[21] State Rec., Vol. 1 of 7.  Petitioner's only state court filings prior to that date were applications seeking documents. However, such applications are not considered applications "for State post-conviction or other collateral review" for tolling purposes because they are preliminary in nature and do not directly call into question the validity of a petitioner's conviction or sentence. Higginbotham v. Tanner, Civ. Action No. 10-1130, 2011 WL 3268128, at *1 (E.D. La. July 29, 2011); Parker v. Cain, Civ. Action No. 02-0250, 2002 WL 922383, at *2 n.22 (E.D. La. May 1, 2002), certificate of appealability denied, No. 03-30107 (5th Cir. June 23, 2003); Boyd v. Ward, Civ. Action No. 01-493, 2001 WL 533221, at *4 (E.D. La. May 15, 2001), certificate of appealability denied, No. 01-30651 (5th Cir. Aug. 22, 2001).

The undersigned further notes that the state argues that even this post-conviction application, despite being on the state's "Uniform Application for Post-Conviction Relief" form, is not fairly construed as an application "for State post-conviction or other collateral review" for tolling purposes.  Rec. Doc. 18, p. 18 n.40.  Because petitioner's federal application is untimely regardless, the undersigned declines to adopt the state's position and, out of an abundance of caution, will consider the application sufficient to toll the federal limitations period.

[22] As noted, the state district court had issued an earlier ambiguous judgment on September 7, 2004; however, it was unclear from that judgment exactly which of petitioner's pending applications were being denied. State Rec., Vol. 1 of 7, Judgment dated September 7, 2004. Accordingly, the undersigned is considering the later unambiguous judgment issued on September 30 to be the relevant ruling for tolling purposes.

[23] A litigant has thirty days to seek review by a Louisiana Court of Appeal. See Louisiana Uniform Rules of the Courts of Appeal Rule 4-3; see also Melancon v. Kaylo, 259 F.3d 401, 404-06 (5th Cir. 2001); Campbell v. Cain, Civ. Action

After the limitations period then resumed running and an additional ninety-eight (98) days elapsed, petitioner again tolled his federal limitations period by filing a post-conviction application with the state district court on February 9, 2005.  Tolling then continued uninterrupted for the duration of the post-conviction proceedings, so long as he sought supervisory review in a timely manner.  Grillette, 372 F.3d at 769-71.  The state concedes that petitioner's related writ applications were timely filed with the appellate courts;[24] therefore, the undersigned finds that tolling continued until the Louisiana Supreme Court denied relief on April 24, 2006.[25]

When the federal limitations period then again resumed running, petitioner had two hundred thirty-three (233) days remaining.  Accordingly, he had only until December 13, 2006, either to again toll the limitations period or to file his federal application.

Petitioner had no other applications pending before the state courts at any time on or before December 13, 2006.  Therefore, he clearly is not entitled to further *statutory* tolling.[26]

However, the Court must also consider whether petitioner is entitled to *equitable* tolling. The United States Supreme Court has expressly held that the AEDPA's statute of limitations is subject to equitable tolling.  Holland v. Florida, 560 U.S. 631, 645 (2010).  That said, "a petitioner

---

No. 06-3983, 2007 WL 2363149, at *3 & n.24 (E.D. La. Aug. 15, 2007).  Because the thirtieth day here fell on a Saturday, and because the following Monday was a state holiday (All Saints' Day), petitioner had until Tuesday, November 2, 2004, to seek such review.  See La. Code Crim. P. art. 13; La. Rev. Stat. Ann. § 1:55.

[24] Rec. Doc. 18, p. 19.

[25] State *ex rel.* Roberts v. State, 926 So.2d 533 (La. 2006); State Rec., Vol. 6 of 7.  A petitioner receives no additional tolling credit for the period during which he could have sought review by the United States Supreme Court with respect to the denial of post-conviction relief.  Lawrence v. Florida, 549 U.S. 327, 332 (2007); Ott v. Johnson, 192 F.3d 510, 512-13 (5th Cir. 1999).

[26] The Court notes that petitioner again sought post-conviction relief in 2013.  However, applications filed after the expiration of the federal statute of limitations have no bearing on the timeliness of a federal application.  See Scott v. Johnson, 227 F.3d 260, 263 (5th Cir. 2000); Magee v. Cain, Civ. Action No. 99-3867, 2000 WL 1023423, at *4 (E.D. La. July 24, 2000), aff'd, 253 F.3d 702 (5th Cir. 2001); Williams v. Cain, Civ. Action No. 00-536, 2000 WL 863132, at *2 (E.D. La. June 27, 2000).  Simply put, once the federal limitations period has expired, "[t]here [is] nothing to toll."  Butler, 533 F.3d at 318.

is entitled to equitable tolling only if he shows (1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way and prevented timely filing."  Id. at 649 (internal quotation marks omitted); accord Davis v. Johnson, 158 F.3d 806, 811 (5th Cir. 1998) (holding that the AEDPA's statute of limitations can be equitably tolled "in rare and exceptional circumstances").  A petitioner bears the burden of proof to establish entitlement to equitable tolling.  Alexander v. Cockrell, 294 F.3d 626, 629 (5th Cir. 2002).  In the instant case, petitioner has brought forth no evidence demonstrating that he is entitled to such tolling, and this Court knows of no reason that would support equitable tolling of the statute of limitations.

Lastly, the Court also notes that the United States Supreme Court has held:  "[A]ctual innocence, if proved, serves as a gateway through which a petitioner may pass whether the impediment is a procedural bar ... or, as in this case, expiration of the statute of limitations." McQuiggin v. Perkins, 133 S. Ct. 1924, 1928 (2013).  Here, petitioner does argue that he is actually innocent.  However, for the following reasons, the undersigned finds that petitioner has not made the showing required under McQuiggin.

In McQuiggin, the Supreme Court expressly cautioned:  "[T]enable actual-innocence gateway pleas are rare:  '[A] petitioner does not meet the threshold requirement unless he persuades the district court that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt.'"  McQuiggin, 133 S. Ct. at 1928 (quoting Schlup v. Delo, 513 U.S. 298, 329 (1995)).  Further, as the United States Sixth Circuit Court of Appeals has explained:

> To assess that question, a court must survey "all the evidence, old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under rules of admissibility that would govern at trial."  House v. Bell, 547 U.S. 518, 538, 126 S.Ct. 2064, 165 L.Ed.2d 1 (2006) (internal quotation marks

7

omitted).  With "all the evidence" thus in mind, the court's final task is "to assess
the likely impact of the evidence on reasonable jurors"; it is not to work through an
"independent factual determination" to divine "what likely occurred."  Id. (internal
quotation marks omitted).

Eberle v. Warden, Mansfield Correctional Institution, 532 Fed. App'x 605, 613 (6th Cir. 2013).

A logical starting point, therefore, is to look at the "old" evidence, i.e. the evidence

presented at trial and on which petitioner's conviction is based.  That evidence is recounted in the

Louisiana Fourth Circuit Court of Appeal's summary of the facts of this case on direct appeal:

> In the early morning hours of September 18, 2001, police officers responded
> to a call of a woman who had been kidnapped and raped and was currently at a
> residence in the 1400 block of Shirley Drive in Algiers.  Officers responding to the
> call found the victim S.M.  The officers eventually took her to Charity Hospital,
> where a rape examination was performed on her.  Kate Palisi, the nurse who
> conducted the examination and who was qualified as an expert in the examination
> and treatment of alleged sexual assault victims, testified that S.M. arrived at the
> hospital with abrasions and bruises, including what appeared to be a bite mark on
> her right shoulder.  She also had abrasions on the inside of her mouth and on her
> left cheek.  Nurse Palisi testified that S.M. told her that she had been standing in
> front of her house when a man drove up and forced her into his car.  He locked the
> doors and hit her when she tried to get away.  S.M. told her the man took her to an
> Algiers park and raped her anally and vaginally.  Nurse Palisi testified her
> examination of S.M. showed no trauma or injury to her anal or vaginal area, but she
> noted it is not uncommon for a victim of such an assault to have no trauma or injury.
> She testified there was no visible semen in the victim's vaginal vault, but S.M.
> indicated to her that she was not sure if the assailant ejaculated.  Nurse Palisi
> testified the victim told her she had last had sexual relations the evening before the
> rape.  She also testified the victim had delivered a child in the past.
>    Heather Close testified she lived in the 1400 block of Shirley Drive on the
> night of the rape.  She testified that at approximately 1:30 a.m. she heard someone
> run onto her front porch and begin pounding on her front door.  She stated she heard
> a woman yelling for help.  She testified her large dog began barking, and she did
> not open the door for the woman because the dog was very protective.  Instead, she
> called 911.  She testified the woman left her porch, and when she looked outside
> she could see wet footprints of bare feet on her porch.  The State played the 911
> tape of Ms. Close's call.
>    Ashley Harding testified she also lived in the 1400 block of Shirley Drive.
> She testified that on the morning of the rape she was watching television with her
> husband when they heard noises and her dog barking at the back of their house.
> She testified her husband went to the back of the house, then came back through

the house to the front and told her to call 911. She stated that after he went out the front door, S.M. ran inside her house through the door. She testified the victim had a bloody lip and blood all over her body, and some hair had been ripped from her head. In addition, she was wearing only a shirt with a ripped collar. Ashley Harding gave the victim a pair of shorts to wear and tried to clean her a bit. Ashley Harding described the victim as shaking, crying, and screaming. The victim told her she was standing on Holmes Boulevard in Terrytown when a man grabbed her, put her in a car, and took her to Behrman Stadium, where he raped her in a field behind the stadium. Ashley Harding testified the victim did not tell her the assailant's name. She further stated the police and S.M.'s mother arrived at the house soon thereafter. She estimated the victim was at her house for thirty to forty-five minutes. Ashley Harding denied knowing either the victim or the defendant prior to this incident. The State also played the 911 tape of Ashley Harding's call.

Scott Harding testified he is Ashley Harding's husband. He testified that Behrman Stadium was located behind his house. He testified that on the night of the rape, he and his wife heard noises at the back of their house. He stated he went to the back yard, but he determined that someone was in the front of his neighbor's house. He went back through his house to the front and saw the victim beating on the front of his neighbor's house. He stated that when the victim saw him standing outside the front of his house, she came over to him from his neighbor's porch. He testified she was dressed only in a torn shirt, she had a bruised and bleeding lip, and some of her hair had been pulled out. He testified she told him she had been raped and asked for his help. He took her inside his house and told his wife to call 911. He then went back outside, leaving the victim and his wife in the house. He stated he did not know the victim or the defendant prior to this incident.

Barbara Winsberry testified she lived in the 1300 block of Shirley Drive. She stated that on the night of the rape she heard someone screaming and called 911. She stated she did not see who was screaming. The State played the tape of her call to 911.

Robert Pender testified he was the victim's boyfriend at the time of this incident. He stated he lived with her, her mother, and her son at a residence on Holmes Boulevard in Terrytown. He admitted having one prior conviction for auto theft. He stated on the night of the rape, he came home from work at approximately midnight. He stated that after staying a short while, he left to go to a store. When he returned approximately an hour later, S.M. was missing. He stated he and the victim's mother waited a while and then canvassed a few neighbors to see if S.M. were visiting them, but their efforts were in vain. Some time later, they received a phone call telling them were the victim was located. He testified they went to a house in Algiers where they met her. He described the victim as bloody and beaten, with a bite mark on her back. He maintained he and the victim never fought, and he denied ever hitting her. He testified he and the victim had sexual relations approximately a week before this incident. He denied knowing the defendant.

The victim's mother testified the victim was seventeen years old at the time of trial, and the victim had a two-year-old son. She testified she, the victim, the

victim's son, and Robert Pender lived together in Terrytown. She stated that on the night of the rape, she and her grandson had gone to bed, and the victim and Robert Pender were watching videos downstairs. She stated that at some point, Robert Pender woke her and told her the victim was missing. She testified she got dressed and helped him look for the victim, and finally they received a phone call telling them the victim's location. She testified she and Robert Pender drove to a residence on Shirley Drive in Algiers, and at first the police would not let her enter to see her daughter. Eventually her daughter came out of the house, and she noticed the victim's shirt was torn, her hair had been pulled, and she had been beaten. She further testified that the police took the victim to the police station and then to Charity Hospital. After they released the victim, she drove the victim home.

The victim's mother testified the victim told her the name of her assailant was Johnnie Ray Roberts. Based on this information, she went to the DMV and told the personnel there a story about someone having stolen her husband's license plate. She convinced someone to look up the name in the computer, and the search revealed the photographs of four men with that name. She went back home and picked up the victim, and the two women returned to the DMV. When the victim viewed the photographs, she chose the photograph of the defendant Johnnie Ray Roberts. The victim's mother then called 911 and reported the defendant's name and address. She testified she went to that address, but the defendant was not there. She stated she then went home and called the Jefferson Parish police. She stated she later told officers from the N.O.P.D. that she had gotten the defendant's name and address off of the Internet. She testified officers eventually came to her house to show her daughter a photographic lineup. She denied knowing the defendant.

S.M. testified that on the night of the rape Robert Pender left for the store soon after coming home from work. She testified she stayed inside for a while waiting for him to return, but at some point she went outside to wait for him on the corner, which was right in front of her house. She stated that as she was standing outside, a champagne-colored Cadillac pulled up and the driver pushed her into the car. She identified that man as the defendant, whom she insisted she did not know before this incident. She testified that after he put her in the car, the defendant locked the doors and drove off toward Algiers. She stated she did not try to get out of the car because she could see he was holding down the lock switch. She testified he punched her in the face five or six times and then stopped the car in a park. He ordered her to get in the back seat and hit her. When she complied, he joined her there. She testified he ordered her to get on her knees, and he removed her shorts and underwear. He raped her anally, and then moved her around and raped her vaginally. She testified that at some point, she told him she had to go to the bathroom, and her ordered her to do so outside the car. She testified she left the car, wearing only a shirt, and acted like she was preparing to go to the bathroom. Instead, she jumped up and started running. She testified he grabbed her by the shirt and hit her in the face, and she hit him back and grabbed him between his legs. He let go, and she again began running, but he caught her again and bit her on her back. She resisted, and eventually he let her go and returned to his car, while she

ran away.  The victim testified she knocked on the doors of three or four houses before someone let her in.  She testified she was given a pair of shorts to wear.  The people who sheltered her called the police and her mother.

S.M. testified that while she was in the car she noticed a temporary license plate with the defendant's name on it.  She testified she did not remember if she told the officers who responded to the call that name, but she stated she gave the name to the officer who took her to Charity for her examination.  She stated she also told her mother the name when they got home.  She admitted she told the nurse at the hospital that her assailant was unknown.  She estimated her mother was gone approximately half an hour before she returned and took her to the DMV.  The victim testified she later chose the defendant's picture from a photographic lineup. She admitted she viewed the lineup after having seen the defendant's picture at the DMV.  She denied knowing the defendant prior to this incident and denied giving him permission to have sex with her.  She positively identified the defendant in court as the man who kidnapped and raped her.

Sgt. Bossetta, of the NOPD, testified he compiled a photographic lineup containing the defendant's picture and showed it to the victim later on the date of the rape.  Det. Baudier testified that the defendant's 1989 tan/champagne Cadillac was found some days after the incident in another part of town.  He testified he had obtained a search warrant for the car, but by the time he was notified that the car had been found, it had been parked for a while with its windows down.  He testified he did not order the crime lab to process the car, because the car had been sitting with its windows open, and the integrity of any evidence in the car would have been compromised.

The parties agreed to three stipulations.  First, it was stipulated that the defendant pled guilty in Jefferson Parish in 1998 to the intentional exposure to the AIDS virus, having bitten the victim in that case in a fight.  The second stipulation was that the rape kits from the examination of the victim were negative for seminal fluid.  The third stipulation was that the spot of blood found on the victim's shirt was DNA-tested and found to be positive for the victim and negative for the defendant.[27]

Therefore, petitioner's guilt was established at trial through the victim's testimony, and it is clear that a victim's testimony alone is generally sufficient evidence to support a conviction. Peters v. Whitley, 942 F.2d 937, 941-42 (5th Cir. 1991); see also Fetterley v. Whitley, No. 94-30310, 1994 WL 708655, at *1 n.6 (5th Cir. Dec. 6, 1994); Holderfield v. Jones, 903 F. Supp. 1011, 1017 (E.D. La. 1995).  However, petitioner argues that that accuracy of the victim's

---

[27] State v. Roberts, 844 So.2d 263, 265-68 (La. App. 4th Cir. 2003) (footnotes omitted); State Rec., Vol. 1 of 7.

testimony is now in doubt as a result of an emergency services form in the district attorney's file which showed that, at the time of the crime, the victim was taking medications with *potential* side effects that *might* have impaired her mental faculties. However, even if that evidence could be considered "new evidence" for the purposes of McQuiggin, and even if that evidence might give some jurors pause, it does not necessarily follow that petitioner has therefore made a colorable showing of actual innocence. On the contrary, it is clear that a claim of actual innocence does not "merely require a showing that a *reasonable doubt* exists in the light of the new evidence, but rather that *no reasonable juror would have found the defendant guilty*." Schlup v. Delo, 513 U.S. 298, 329 (1995) (emphasis added). Moreover, the United States Supreme Court further explained:

> It is not the district court's independent judgment as to whether reasonable doubt exists that the standard addresses; rather the standard requires the district court to make a probabilistic determination about what reasonable, properly instructed jurors would do. Thus, a petitioner does not meet the threshold requirement unless he persuades the district court that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt."

Id.

Here, it simply cannot be said that the information on the emergency services form, when considered along with the evidence at trial, would now cast this case in such a different light that *no* reasonable juror would have found petitioner guilty. Therefore, petitioner has failed to make the threshold showing required by McQuiggin.

Because petitioner is not entitled to further statutory tolling, and because he has not established that he is eligible for equitable tolling or that the McQuiggin "actual innocence" exception applies, his federal application for habeas corpus relief had to be filed no later than December 13, 2006, in order to be timely under Subsection A. His federal application was not filed until on or after September 15, 2014, and, therefore, it is untimely under that subsection.

12

**28 U.S.C. § 2244(d)(1)(D)**

Petitioner, however, argues that his application is timely because Subsection D -- not Subsection A -- applies in this case. As previously noted, Subsection D delays the commencement of the federal limitations period until "the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence." 28 U.S.C. § 2244(d)(1)(D). Here, petitioner argues that his claims are based on a factual predicate which he did not discover until he received a copy of the district attorney's file on February 6, 2013. Specifically, petitioner's claims are based on the emergency services form in that file which showed that, at the time of the crime, the victim in this case was taking medications with potential side effects that might have impaired her mental faculties.

However, as the state correctly notes, even if Subsection D applies here, the limitations period under that subsection commences when a petitioner *could have* discovered the factual predicate with due diligence, *not* when he *in fact did so*. Therefore, even if the Court assumes for the purposes of this decision that petitioner did not have access to the emergency services form from other sources at an earlier time, it was available to him no later than when the district attorney's file became legally available to him.[28]

Moreover, on that point, Louisiana law is clear: a district attorney's file is subject to disclosure as a public record when the underlying criminal litigation is "finally adjudicated or otherwise settled." La. Rev. Stat. Ann. § 44:3(A)(1). "In the context of § 3(A)(1), instituted

---

[28] As the state correctly notes in its response, this assumption appears to be overly generous. The state notes that a copy of the emergency services form is in fact included in the state court records from petitioner's direct appeal. Because that record is essentially the state district court record as it existed at the conclusion of petitioner's trial, one could reasonably infer that the form was therefore available to petitioner at that time. Nevertheless, because the outcome is not changed by the assumption, the undersigned will simply assume that the report was not available to petitioner until he had access to the district attorney's file.

criminal litigation is 'finally adjudicated' when the conviction becomes final ([La.C.Crim.P.] Art. 922) or is 'otherwise settled' either by dismissal or by nolle prosse of the formal accusation of the DA." Harrison v. Norris, 569 So.2d 585, 589 (La. App. 2d Cir. 1990) (emphasis omitted); see also Wallace v. Ware, 657 So.2d 734, 737 (La. App. 1st Cir. 1995) ("[A] criminal defendant cannot be denied access to his criminal files after his conviction becomes final."). The possibility that a convicted person may still seek post-conviction relief has no effect on § 3(A)(1). "Post conviction relief ... is not 'criminal litigation' within the meaning of the Public Records Act." Lemmon v. Connick, 590 So.2d 574, 575 (La. 1991) (per curiam).

Therefore, *at the latest*, petitioner could have gained access to the district attorney's file and the emergency services form on which his claim is based as soon as his conviction became final on direct appeal, and so it is at that point that his limitations period would have commenced even if Subsection D is applicable. See Hunter v. Cain, Civ. Action No. 11-670, 2011 WL 5024355, at *3-4 (E.D. La. Sept. 23, 2011), adopted, 2011 WL 5023908 (E.D. La. Oct. 201, 2011); Ballay v. Louisiana, Civ. Action No. 06-10699, 2007 WL 4413990, at *4-5 (E.D. La. Dec. 13, 2007); Heard v. Cain, Civ. Action No. 06-3207, 2007 WL 763691, at *3 (E.D. La. Mar. 9, 2007). As a result, Subsection D would gain petitioner no delay of the commencement date other than that already available to him under Subsection A. Hunter, 2011 WL 5024355, at *3-4. Accordingly, even if § 2244(d)(1)(D) is applicable, petitioner's federal application is still untimely for the reasons previously explained.

Because petitioner's federal application is untimely under either § 2244(d)(1)(A) or (D), and because § 2244(d)(1)(B) and (C) are clearly inapplicable, the undersigned finds that the application should be dismissed as untimely filed.

## RECOMMENDATION

It is therefore **RECOMMENDED** the federal application for habeas corpus relief filed by Johnnie R. Roberts be **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  28 U.S.C. § 636(b)(1); Douglass v. United Services Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).[29]

New Orleans, Louisiana, this third day of May, 2016.

**SALLY SHUSHAN**
**UNITED STATES MAGISTRATE JUDGE**

---

[29] Douglass referenced the previously applicable ten-day period for the filing of objections.  Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend that period to fourteen days.